UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANTE J. BENCIVENGA,

        Plaintiff,

v.

UNUM LIFE INSURANCE COMPANY
OF AMERICA,

        Defendant.

Case No. 14-10118

Hon. Patrick J. Duggan

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT BASED ON THE ON ADMINISTRATIVE RECORD BUT GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS COUNTERCLAIM

Plaintiff Dante J. Bencivenga seeks judicial review of the termination of long-term disability benefits under a group insurance policy (the "Policy") issued by Defendant Unum Life Insurance Company of America ("Unum"). Bencivenga received benefits under the Policy from 2007 through mid-2013, when Unum terminated his benefits upon concluding that Bencivenga no longer satisfied the Policy's disability standard. On January 13, 2014, after exhausting Unum's internal administrative procedures, Bencivenga filed this lawsuit pursuant to 29 U.S.C. § 1132(a)(1)(B), a provision of the Employee Retirement Income Security Act of 1974 ("ERISA"), seeking a declaration that he is entitled to reinstatement of

his benefits and an award of back benefits.[1]  Unum subsequently filed an answer, along with affirmative defenses, to Bencivenga's Complaint, as well as a counterclaim seeking reimbursement of funds it paid to Bencivenga in excess of the amount to which he was entitled.[2]

Presently before the Court is Unum's August 15, 2014 Motion for Judgment Based on the Administrative Record and Motion for Partial Summary Judgment on Defendant's Counterclaim.  The Motion for Judgment Based on the Administrative Record asks this Court to determine that Unum properly terminated Bencivenga's benefits while the Motion for Partial Summary Judgment seeks a ruling on Bencivenga's liability to repay allegedly wrongfully dispersed benefits, but not on the issue of the amount he must remit.  The matter has been fully briefed.  Having determined that oral argument would not significantly aid the decisional process,

---

[1] This statute provides, in pertinent part, that a "participant or beneficiary" may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. §1132(a)(1)(B).

[2] Initially, two counterclaims were asserted against Bencivenga: one involving overpayment due to Bencivenga's receipt of other income from his place of employment, and the other claiming that Bencivenga had been overpaid due to his receipt of group disability benefits from another policy.  (Counterclaim, ECF No. 11.)  Unum subsequently abandoned the latter counterclaim, presumably in recognition of its own financial analysis indicating that "we would not coordinate benefits with other carrier as [Bencivenga] is an [employee] of both companies, therefore there is no related overpayment."  (ECF No. 16-4, Pg ID 2959; *see also* Def.'s Reply 5, ECF No. 23 ("Unum's Motion for Partial Summary Judgment does not relate to Mr. Bencivenga's receipt of benefits from [the other group disability policy].")

2

the Court dispensed with oral argument pursuant to Eastern District of Michigan

Local Rule 7.1(f)(2).  For the reasons set forth herein, the Court will deny Unum's

request for judgment on the administrative record and will remand the action to

Unum for further factual development.  However, the Court will grant Unum's

request for partial summary judgment on its counterclaim.

## I.      BACKGROUND

**A.      The Policy, Bencivenga's Disability, and Medical Records**

Unum issued a long-term disability policy to Bencivenga's employer,

Bencivenga Insurance Agency, Inc., in July 1993.  (ECF No. 15, Pg ID 54.)

Bencivenga, the owner of the insurance agency, applied for benefits under the

Policy in January of 2007, alleging a disability onset date of December 16, 2006.

(*Id.* at Pg ID 122-24.)

Bencivenga's claim for income protection benefits included an attending

physician statement from James Carney, M.D., Bencivenga's primary care

physician.  (*Id.* at Pg ID 129-31.)  In this statement, Dr. Carney indicated that

Bencivenga suffered from severe neck and arm pain due to degenerative disc

disease, and that this pain precluded Bencivenga from performing even sedentary

work.[3]  (*Id.*)  Specifically, Dr. Carney indicated that Bencivenga could

_____

[3] "*Degenerative disc disease*, or spondylosis, of the cervical spine is
characterized by deterioration, fragmentation, and resultant narrowing and collapse
of the discs.  This places stress on the facet joints of the vertebrae, as well as

3

"intermittently" sit, stand, and walk during an eight-hour workday, meaning that he could only perform each task for one hour per workday. (*Id.* at Pg ID 130.) Dr. Carney further assessed Bencivenga as being unable to: climb, twist/bend/stoop; reach above shoulder level; push/pull; or operate heavy machinery. (*Id.*) However, Bencivenga was deemed able to "occasionally" (i.e., 1-33% of the time) lift up to ten pounds and to engage in tasks requiring fine finger movements. (*Id.*)

On May 14, 2007, Unum sent Bencivenga a letter informing him that his request for long-term disability benefits had been approved under the Policy's "Disability," as opposed to the "Partial disability," provisions. (*Id.* at Pg ID 420-22.) A Rider attached to the Policy provides the following definitions:

> "Disability" and "disabled" mean that because of injury or sickness you cannot perform each of the material duties of your regular occupation.
>
> "Partial disability" and "partially disabled" mean that because of injury or sickness you, while unable to perform all the material duties of your regular occupation on a full-time basis, are:
>
> > a. performing at least one of the material duties of your regular occupation or another occupation on a part-time basis or full-time basis; and
> >
> > b. currently earning at least 20% less per month than your indexed pre-disability earnings due to that same injury or sickness.

---

adjacent vertebral bodies. As the condition progresses, arthritis develops as osteophytes, or bone spurs, form as the bone spreads out in an effort to distribute weight across the joint surface more evenly." (ECF No. 16, Pg ID 2064 (emphasis in original).)

4

(*Id.* at Pg ID 296.)  By approving his claim, Unum acknowledged that the available medical evidence supported Bencivenga's contention that he could not engage in his regular occupation as an insurance agency owner.  A vocational analysis requested by Unum and completed by consultant Betty D. Morris on May 22, 2013, indicates that the material and substantial duties of an insurance agency owner include those attendant with selling insurance to existing and potential customers, such as researching policies, calling prospective and current clients, and meeting with prospective and current clients.[4]  (ECF No. 17-1, Pg ID 3878-79.)

The letter approving Bencivenga's claim goes on to state that "[a]lthough we are approving benefits at this time, you must continue to meet the definition of disability in your policy in order to qualify for ongoing benefits."  (ECF No. 15, Pg ID 421.)  This is consistent with the Policy language, which provides: "You must give us proof of continued disability and regular attendance of a physician within 30 days of the date we request the proof."  (*Id.* at Pg ID 316.)  From the time of the initial claim approval through mid-2013 (when Bencivenga's benefits were terminated), Unum paid to Bencivenga disability benefits at a rate of

---

[4] The physical requirements of an insurance agency owner are classified as sedentary more than half of the time, with others classified as requiring a light exertional level.  (ECF No. 17-1, Pg ID 3880.)  The vocational analysis appears to conclude that Bencivenga's position fell within the sedentary category based on a job description that Bencivenga submitted in 2007.  Sedentary work is defined as "[e]xerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body."  (*Id.*)

5

approximately $6,000 per month "due Cervical Radiculitis with reported exacerbations of arm and neck pain."[5]  (*See, e.g.*, ECF No. 17-1, Pg ID 3867.)

A sampling of treatment notes beginning in 2009 provides greater insight into Bencivenga's physical and psychological condition.  In January 2009, Dr. Carney examined Bencivenga, noting that "neck range of motion remains severely limited with severe limitation and pain in the upper extremity with range of motion."  (ECF No. 16, Pg ID 2058.)   Although Bencivenga reported "'reasonable relief from his current complicated medical regimen' of methadone, oxycodone, and ibuprofen, as well as [other prescriptions relating to Bencivenga's mental health,]" Dr. Carney concluded that Bencivenga had "significant physical disability" from cervical pain and radiculopathy.  (*Id.*)  Bencivenga had undergone nerve root blocks and received epidural injections in the past to relieve his pain, but these provided minimal relief.

In a letter dated February 18, 2009, Christopher Y. Chang, M.D., a pain management specialist, explained that he had been treating Bencivenga for neck pain and fibromyalgia for roughly one year.[6]  The letter states:

---

[5] One medical dictionary defines "radiculitis" as "inflammation of the root of a spinal nerve, especially of that portion of the root which lies between the spinal cord and the intervertebral canal."  Dorland's Illustrated Med. Dictionary 1405 (27th ed. 1988).

[6] The National Institute of Arthritis and Musculoskeletal and Skin Diseases, part of the National Institutes of Health, explains that "[f]ibromyalgia syndrome is

> The patient has developed debilitating right shoulder and arm pain and numbness, as well as paresthesias and dysesthesias. . . .   A MRI scan showed degenerative disease at C5/C6, C6/C7, and C7/T1.   He underwent two diagnostic selective nerve blocks which confirmed the presence of a C7 radiculopathy on the right.   He is being treated with physical therapy and medications.

(ECF No. 16, Pg ID 2124.)  Magnetic Resonance Imaging ("MRI") of Bencivenga's cervical spine taken approximately six months after Dr. Chang's letter revealed moderate to marked degenerative changes greatest at C5-6 and C6-7, which had progressed since Bencivenga's last MRI in 2005.  (*Id.* at Pg ID 2060.) "Specific findings included endplate degenerate signal changes and mild to moderate bilateral neural foraminal narrowing at C5-6 and C6-7, but no evidence of a herniated disc or spinal stenosis, and no abnormal signal intensity changes in the cervical spinal cord."  (*Id.*)

In February 2010, a full record review by Unum deemed Dr. Carney's restrictions and limitations to be "reasonably supported although a greater level of functional ability was noted as being possible."  (*Id.* at Pg ID 2003.)  Sometime thereafter, Unum learned that Bencivenga was receiving benefits in the amount of $1,200-1,400 per month under a second group disability policy issued by Union Security d/b/a Assurant.  Upon acquiring this information, it appears that Unum

---

a common and chronic disorder characterized by widespread pain, diffuse tenderness, and a number of other symptoms. . . .  [L]ike arthritis, fibromyalgia is considered a rheumatic condition, a medical condition that impairs the joints and/or soft tissues and causes chronic pain."  Questions and Answers about Fibromyalgia, July 2014, http://www.niams.nih.gov/Health_Info/Fibromyalgia/.

began to more closely scrutinize Bencivenga's disability claim.  In addition, Unum
began exploring whether the income from the second policy could offset Unum's
payments.[7]  Unum ultimately concluded that it could not.  *See* note 1, *supra*.

An MRI of Bencivenga's cervical spine in September 2010 revealed "[l]oss
of normal cervical lordosis with bilateral spondylotic disc displacements at C5-C6
and C6-C[7] . . . resulting in borderline mild central canal stenosis without cord
compression."  (ECF No. 16-4, Pg ID 2926.)  During Bencivenga's 2010 office
visits with Dr. Chang, he "continued to be treated . . . for his neck and upper back
pain and Fibromyalgia with methadone and oxycodone. . . .  He had tingling in
both arms . . . his neck was stiff and [his range of motion] was decreased."  (*Id.* at
Pg ID 2928.)  In October 2010, he "had decreased cervical lordosis, spasm,
tenderness and stiffness as well as decreased [range of motion]."  (*Id.*)

In September of 2010, the Social Security Administration ("SSA") denied
Bencivenga's request for social security disability insurance benefits ("DIB")
benefits following a hearing before an Administrative Law Judge ("ALJ").  (ECF

---

[7] The Court notes that at some point in 2010, Unum received a medical
report on Bencivenga prepared by a physician consultant hired by Assurant
Employee Benefits by the name of Elizabeth J. Englehardt, M.D.  (Def.'s Br. 3; *see
also* ECF No. 16, Pg ID 2056-66.)  Dr. Englehardt reviewed Bencivenga's medical
records "as well as video-taped surveillance of Mr. Bencivenga conducted in
December 2008."  (Def.'s Br. 4.)  The report's unfavorable conclusions regarding
Bencivenga and his disability are not given any weight herein, as the surveillance
apparently produced video footage of Bencivenga's father, which Dr. Englehardt
then relied upon in rendering her decision.

No. 17-1, Pg ID 3698-3708.)  The ALJ concluded that Bencivenga was not disabled within the meaning of the Social Security Act.  The SSA's Appeals Council upheld the ALJ's decision in April of 2012.  (*Id.* at Pg ID 3690.)  While Unum continued to pay Bencivenga's disability benefits despite the adverse SSA ruling, it continued to engage in periodic reviews seeking information regarding whether the restrictions and limitations recommended by Dr. Carney were objectively verifiable.

The medical records from 2011 are consistent with the earlier records.  On March 16, 2011, Dr. Carney diagnosed Bencivenga with a host of issues, including "Chronic pain syndrome – cervical degenerative / stenosis[.]"  (ECF No. 16-4, Pg ID 2929.)  In April 2011, Dr. Chang's notes from a physical examination "showed his neck was stiff and tender with his [range of motion] moderately limited. . . ."  (*Id.* at Pg ID 2929.)  An examination on June 3, 2011 "showed a stiff neck with tenderness, decreased [range of motion] and paresthesia of right finger.  The Spurling's was positive indicating nerve impingement or irritation.  An MRI was ordered."[8]  (*Id.*)  On June 22, 2011, a "3 Tesla MRI"[9] of the cervical spine revealed "[s]evere degenerative disc disease at the C5-C6 and C6-C7 (severe

---

[8] A Spurling's test looks for neural foraminal compression of the cervical spine.  (ECF No. 16, Pg ID 2058.)

[9] A 3 Tesla MRI "is 1.5 times the strength of a standard MRI or 10-15 times than open MRI [and] produces exceptional anatomical detail."  (ECF No. 16-4, Pg ID 2930.)

narrowing with bony edema/fat marrow replacement involving the end plate of C5 C6 which may represent Modic types I and II) levels, stable." [10]   (*Id.* at Pg ID 2926-27.)   A subsequent Spurling's test was negative.

The administrative record reveals that through 2011, Bencivenga continued to fill prescriptions for a variety of medications, some for pain relief.  For instance, from January through September 2011, Bencivenga filled prescriptions for oxycodone (a pain medication) seven times.  (*Id.* at Pg ID 2930.)

What did change in 2011, at least to a limited degree, were Bencivenga's conversations with his psychiatrist, Elliot Luby, M.D.  Bencivenga, who "has a long history of depression and panic disorders" dating back to "at least" April 1999, met with Dr. Luby roughly once every month.  (*Id.* at Pg ID 2951.) Bencivenga's psychiatric treatment records are discussed in greater detail in the analysis portion of this Opinion and Order.  For now, it suffices to say that Bencivenga was not claiming disability as a result of his mental health issues.  As such, Dr. Luby did not recommend any restrictions and limitations to accommodate Bencivenga's psychological conditions.  Unum discusses Dr. Luby's treatment notes because Bencivenga made various statements to him about his physical condition as well as his involvement with the insurance agency.

---

[10] "The Modic Type I changes represent marrow edema and are associated with an acute process.  Type I will convert with time to Type II . . . .  The Type II changes are consistent with a chronic process and usually remain[] stable."  (ECF No. 16-4, Pg ID 2930.)

A note in the administrative record dated March 30, 2011 indicates that the restrictions and limitations "remain supported and [Bencivenga] would be unable to perform his own occupational duties due to the ongoing chronic pain and methadone use." (*Id.* at Pg ID 2959.) However, by late October 2011, Unum employee Nora K. Gregory, R.N., conducted a review of the medical records in Bencivenga's file (a "file review"[11]), specifically the treatment records of Dr. Carney (internal medicine), Dr. Chang (pain specialist), and Dr. Luby (psychiatrist), concluding that Dr. Carney's restrictions and limitations – that Bencivenga was unable to sit, type, stand, or walk for extended periods of time – were "overly restrictive[.]" (*Id.* at Pg ID 2930.) Nurse Gregory explained this conclusion as being based on her opinion that the restrictions "do not have exam findings to support and the radiological findings are questionable as to the level of functional impairment they support."[12] (*Id.*)

In December of 2011, Bencivenga attended an appointment with Paul Park, M.D., a neurosurgeon at the University of Michigan Hospital and Health Centers to

---

[11] As the description suggests, a file reviewer does not physically examine the subject of the review.

[12] Interestingly, an activity report generated by a different Unum employee dated December 21, 2011, provides that the restrictions and limitations "are supported that would preclude [Bencivenga] from performing the duties at a light physical capacity. Diagnostic imaging and EMG findings indicate findings at C5-6 with nerve impingement. MRI shows degenerative changes." (ECF No. 16-4, Pg ID 2947.)

11

discuss potential surgical interventions to ease his cervical pain.  Dr. Park's notes

indicate that "On physical examination, Mr. Bencivenga . . . is in minor discomfort

due to pain. . . .  On examination, he is neurologically intact[.]"  (ECF No. 17-1, Pg

ID 3656-57.)  "Patient's MRI of the C-spine performed at an outside facility was

reviewed and demonstrated arthritic change throughout his cervical spine.  This

degenerative change is not associated with any significant central canal or neural

foraminal stenosis."  (*Id.* at Pg ID 3657.)  "There is no acute neurosurgical

intervention indicated at this time."  (*Id.*)  Dr. Park told Bencivenga about his

degenerative disc disease in his spine "and the fact that it does not appear to be

causing any significant encroachment on his spinal cord or nerves.  We did not

recommend surgery."  (*Id.*)  Bencivenga did inquire about other options, and was

therefore given a referral to Michigan's Spine Clinic.

## B.    Unum Terminates Bencivenga's Disability Benefits

In 2013, as part of its continuing review of Bencivenga's claim, Unum

solicited three medical practitioners to conduct file reviews of the medical

information in Bencivenga's file to determine whether the objective medical

evidence substantiated the restrictions and limitations  suggested by Dr. Carney.[13]

---

[13] Dr. Carney indicated the following restrictions and limitations in August 2012: "unable to lift, unable to sit, stand or walk for extended periods of time." He opined that Bencivenga retained the functional capacity to: "Occasionally sit, stand, walk, walk, twist/bend/stoop, fine finger movements, pushing/pulling (10 pounds), lift up to 20 pounds, never climb, operate heavy machinery, frequently

As with Nurse Gregory, none of these reviewers personally examined Bencivenga. Two of the three reviewers were employed by Unum.

Debra Maeder, R.N., reviewed the medical records from 2010 through the date of her opinion (May 2013), noting that "[b]ased on the whole person analysis, . . . the insured has continued to have complaints of chronic pain in excess of the physical findings and diagnostic results. . . .  Diagnostics revealed no evidence of herniated disc or significant spinal stenosis to support the insured's chronic pain complaints."  (ECF No. 17-1, Pg ID 3864.)  Nurse Maeder concluded her analysis by opining that "[t]he current medical information does not support the inability to perform most seated functionality."  (*Id.*)

Unum's in-house physician, Tony Smith, D.O., offered a second opinion upon reviewing the available medical records.  Dr. Smith's report echoed Nurse Maeder's, finding that the restrictions and limitations recommended by Dr. Carney were "not supported[,]" even when assigning "appropriate weight to the certifying physician's opinion[.]"[14]  (*Id.* at Pg ID 3871.)  Dr. Smith noted that "imaging

---

hand/eye coordinated movements."  These opinions were in a treatment note indicating that Bencivenga had symptoms of "severe neck/arm pain, weakness in upper extremities, numbness in hands[,]" and diagnosing Bencivenga with degenerative disc disease and spinal stenosis.  (ECF No. 17-1, Pg ID 3720.)

[14] The Court notes that "the Supreme Court has explicitly declined to extend the treating physician rule to ERISA cases."  *McCollum v. Life Ins. Co. of N. Am.*, 495 F. App'x 694, 702 (6th Cir. 2012) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 123 S. Ct. 1965, 1967 (2003) ("We hold that plan

studies document no worsening of the" spine "since 2009."[15]  (*Id.*)  He also noted

treatment records revealed no new physical deficits and that no surgery had been

performed.  (*Id.*)  In Dr. Smith's opinion, the objective medical evidence did "not

support a complete lack of functionality."  (*Id.*)

In the interest of reconciling the disability finding by Dr. Carney with the

two internal reviews concluding the opposite, Unum sent the medical records to

medical consultant Susan Council, M.D.  Consistent with Dr. Smith's opinion, Dr.

Council determined that Bencivenga could perform sedentary work.  According to

Dr. Council, "Dr. Carney's opinion appears to be based on Mr. Bencivenga's

complaints of pain combined with his Behavioral Health conditions (which are not

considered in this review due to policy limitations)."[16]  (*Id.* at Pg ID 3876.)

Equipped with these three file reviews, Unum terminated Bencivenga's

disability benefits on May 29, 2013.

---

administrators are not obliged to accord special deference to the opinions of
treating physicians.")).

[15] At least one of Bencivenga's physicians disagreed, noting, upon review of
an April 25, 2012 MRI of the cervical spine, "moderate degenerative osteoarthritic
changes of the cervical spine.  Narrowing and sclerotic changes of the
intervertebral disc space at C5-6 and C6-7."  (ECF No. 17-1, Pg ID 3653.)
Further, the record contains MRIs from June 2011 MRI and September 2010, both
of which documented medically-determinable changes.  (ECF No. 16-3, Pg ID
2757; ECF No. 16-4, Pg ID 2926-27.)

[16] The Policy limits disability based on behavioral health conditions to a
period of twenty-four months.

14

Just prior to terminating Bencivenga's benefits, Unum sent Bencivenga a letter indicating that based on a review of available tax returns, it determined that Bencivenga had been overpaid by approximately $90,000 due to his receipt of income from the insurance agency.  (ECF No. 17-1, Pg ID 3855 (May 2, 2013 Letter).)   In July 2013, Unum requested repayment in the amount of $87, 202.68, which it requested once again on November 6, 2013.  (ECF No.17-2, Pg ID 4086.)  To date, Bencivenga has not repaid Unum for these allegedly wrongfully dispersed disability benefits.

## C.   Bencivenga's Internal Administrative Appeal

By way of a letter dated August 21, 2014, Bencivenga's legal counsel requested an internal appellate review of the termination decision.  (ECF No. 17-2, Pg ID 4069.)  As part of the appellate review, Unum referred Bencivenga's file to Charles Sternbergh, M.D., "our physician who is board certified in neurological surgery[.]"  (*Id.* at Pg ID 4069.)   In his report, Dr. Sternbergh noted a conversation occurring in March 2013 (before Bencivenga's benefits were terminated) between an employee of Unum and Dr. Carney in which Dr. Carney said that Bencivenga's "pain complaints are intertwined with his [behavioral health] condition."  (*Id.* at Pg ID 4055.)  During that conversation, Dr. Carney also conveyed his belief that Bencivenga was not capable of performing his own occupation.  (*Id.*; *see also* ECF No. 17-1, Pg ID 3860 (noting that in March 2013, Dr. Carney indicated that

15

Bencivenga was "unable to sustain the physical activity required of his previous full-time occupation").)  Dr. Sternbergh also noted that in July 2013, after Bencivenga's benefits had been terminated, Dr. Carney indicated that he was misquoted in his contact with Unum in March 2013.  (ECF No. 17-2, Pg ID 4069.) He indicated that Bencivenga suffers from chronic pain syndrome that "significantly affected his life and prevents him from working to the fullest capacity in his previous position as an insurance agent.  Minimal activities, minimal lifting and long periods of inactivity, such as desk work or phone work, cause him intermittent significant pain."  (*Id.*)  Dr. Carney also emphasized "the fact that surgery was not completed, was not evidence of a lack of disease."  (*Id.* at Pg ID 4070.)

Despite the acknowledgement of restrictions and limitations, Dr. Sternbergh opined that Bencivenga "could sustain full time sedentary physical demand activities," including his own occupation.  (*Id.* at Pg ID 4058.)  As support, he explained that Bencivenga often traveled between Florida and Michigan, continued to operate a motor vehicle, played golf on occasion, and at times assisted his wife with household chores.

Addressing the March and July conversations with Dr. Carney, Dr. Sternbergh's report notes:

> Although claimant's internist and attorney have opined he has behavioral health issues because of cervical pain, claimant's long time

psychiatrist . . . has stated the opposite.  Cervical symptoms were improved when behavioral health symptoms were optimized.

(*Id.* at Pg ID 4059.)[17]

Dr. Sternbergh's report concludes as follows:

It would be anticipated the localized degenerative narrowing at C5-6 and C6-7 will eventually fuse, and with this decreased motion, symptoms of neck pain would improve.  [In] my opinion, this is happening now and is responsible for current improvement of cervical symptoms, and will continue.  Therefore, it is my opinion that claimant could reasonably sustain full time sedentary physical demand activities with accommodation to prevent work activities above shoulder level.

(*Id.*)

In addition to sending Bencivenga's file to Dr. Sternbergh, Unum conducted a second vocational analysis on appeal.  Unlike the May 2013 analysis, the second incorporated a restriction limiting Bencivenga from working above shoulder level.  The report concludes that in his occupation as the owner of an insurance agency,

---

[17] The reference to Bencivenga's psychiatrist involves treatment notes from Dr. Luby in late 2010, in which he wrote:

"Curiously, his neck pain is gone.  When he was told that it was stress related he then began to see himself as a fraud. . . ."

". . . .  He is still experiencing some pain but he knows that it is magnified 'one thousand times' by the environmental circumstances in his life."

(ECF No. 16-3, Pg ID 2636, 2634.)

17

Bencivenga would not be required to perform any work above shoulder level, and that he was therefore able to return to his occupation. (*Id.* at Pg ID 4062-63.)

Unum's appeals unit rendered a decision on October 24, 2013, upholding the decision to terminate benefits. (*Id.* at 4068-73.)

**D.   Legal Proceedings**

Bencivenga instituted the present action pursuant to 29 U.S.C. § 1132(a)(1)(B) on January 13, 2014. Unum filed an answer, affirmative defenses, and counterclaims on March 5, 2014. The administrative record, which the Court permitted to be filed under seal, was filed on May 30, 2014. On August 15, 2014, Unum filed its Motion for Judgment Based on the Administrative Record and Motion for Partial Summary Judgment on Defendant's Counterclaim. Bencivenga responded on September 2, 2014, and Unum replied on September 18, 2014.

## II.   GOVERNING LEGAL STANDARD

The standard used to review the denial of ERISA benefits depends on the language used in the plan itself. If the plan vests discretionary authority in the administrator, the denial may be reversed only upon a showing that the decision was "arbitrary and capricious." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 660 (6th Cir. 2004). If the plan vests no discretionary authority in the administrator, as the parties agree is the case here, then the decision should be reviewed *de novo*. *Firestone Tire & Co. v. Bruch*, 489 U.S. 101, 102, 109 S. Ct. 948, 950 (1989).

When a court reviews a denial of ERISA benefits *de novo*, it is simply required to determine "whether or not it agrees with the decision under review." *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990). In other words, a court's task is to decide "whether the administrator . . . made a correct decision." *Id*. at 967. The administrator's decision is accorded no deference or presumption of correctness. *Id*. at 966. Further, review is limited to the record before the plan administrator and a reviewing court must decide whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan. *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 809 (6th Cir. 2002). For the reasons that follow, this Court disagrees with Unum's decision to terminate Bencivenga's disability benefits.

## III.   ANALYSIS

The central issue presented in this action is whether Unum properly terminated Bencivenga's long-term disability benefits. If not, the Court must fashion a remedy.[18] The Court must also address the issue (raised in Unum's counterclaim) of whether Unum is entitled to recover funds it paid to Bencivenga.

## A.   Unum Improperly Terminated Bencivenga's Disability Benefits

---

[18] In its portion of its Answer asserting affirmative defenses, Unum contends that if the Court finds that Bencivenga is eligible for benefits, it cannot order that the benefits be paid for life due to various Policy exclusions. (Answer 8, ¶ 16.)

"To succeed in his claim for disability benefits under ERISA, [Bencivenga] must prove by a preponderance of the evidence that he was 'disabled,' as that term is defined in the [Policy]." *Javery v. Lucent Techs., Inc. Long Term Disability Plan*, 741 F.3d 686, 700-01 (6th Cir. 2014) (citations omitted). The Policy under which Bencivenga received benefits provides that in order to be considered disabled, a claimant must demonstrate that "because of injury or sickness" he or she is unable to "perform each of the material duties of [their] regular occupation." (ECF No. 15-1, Pg ID 296.) The Policy places on Bencivenga a continuing burden of demonstrating his eligibility for benefits. Unum argues that Bencivenga failed to discharge this burden, which resulted in the termination of his disability benefits. More specifically, Unum contends that by 2011, "it became clear that Mr. Bencivenga's medical condition was improving and that his pain was diminishing." (Def.'s Br. 6.) Conversely, Bencivenga contends that the record contains ample evidence of pain rendering him disabled within the meaning of the Policy.[19]

The administrative record documents Bencivenga's various medical conditions, such as cervical radiculitis, "[c]hronic pain syndrome – cervical degenerative / stenosis with a history of myelopathy, [d]epression," and panic

---

[19] As Unum points out, the portions of the administrative record cited by Bencivenga to support this assertion are rather dated, as Bencivenga points to no medical evidence after 2008.

disorders.  (*See, e.g.*, ECF No. 16-4, Pg ID 2929.)  However, the presence of a medically-determinable condition does not necessarily translate into a finding of disability and "[r]equiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable."  *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 166 (6th Cir. 2007); *Huffaker v. Metro. Life Ins. Co.*, 271 F. App'x 493, 500 (6th Cir. 2008).  While there is no objective medical evidence of record indicating that Bencivenga's degenerative disc disease improved between 2007 and 2013, this does not end the matter (although, it is relevant, *see* discussion *infra*).[20] *Likas v. Life Ins. Co. of N. Am.*, 347 F. App'x 162, 167 (6th Cir. 2009) ("Plaintiff must provide continued proof of his disability under the policy; [the insurance company] does not bear the burden of showing that plaintiff's eligibility has ended.") (internal quotation marks omitted).

Unum contends that although Bencivenga initially satisfied the Policy's disability standard, he subsequently failed to discharge his continuing burden to demonstrate a disability precluding him from engaging in his occupational duties. Unum acknowledges that objective medical evidence supports Bencivenga's diagnosis of degenerative disc disease, among other back-related conditions, as well as his reports of chronic pain.  It disputes, however, that Bencivenga's

---

[20] While somewhat dated, an activity report generated by Unum indicates that a review conducted in November 2010 "noted that no significant improvement is noted in the updated records[.]"  (ECF No. 16-4, Pg ID 2959.)

limitations are as severe as he claims and questions whether the objective medical evidence supports the extent of his claimed limitations.  According to Unum, the "only" objective medical evidence supporting Bencivenga's claim of continued disability is "his own self-reported claims of pain in his neck and arms."  (Def.'s Br. 14.)  According to Unum, these subjective claims – not the underlying medical conditions – resulted in Dr. Carney's opinion that Bencivenga was unable to return to work.  Although a lack of objective medical evidence is a proper reason to deny disability benefits, *Cooper*, 486 F.3d at 166, the Court has identified several issues with Unum's termination decision.  The Court addresses its concerns in turn.

## 1.   *Unum's Use of File Reviews*

Despite the Sixth Circuit's approval of the use of file reviews by qualified medical practitioners in the context of benefits determinations, such approval has not been wholly unqualified.  *See, e.g.*, *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013).  In *Judge*, the Sixth Circuit examined whether an insurer "erred in conducting a file review by a nurse in lieu of having [the plaintiff] undergo an independent medical examination[.]"  710 F.3d at 654.[21]  The court started with the premise that "'the failure to conduct a physical examination . . .

---

[21] The panel in *Judge* reviewed this question under the arbitrary and capricious standard, not the *de novo* standard applicable in the instant action. While the standards differ, the Court notes that cases employing the *de novo* standard have also questioned the use of file-only reviews.  *See, e.g.*, *McCollum v. Life Ins. Co. of N. Am.*, 495 F. App'x 694, 703-04 (6th Cir. 2012).

may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination,' but 'reliance on a file review does not, standing alone, require the conclusion that [a plan administrator] acted improperly.'" *Id.* at 663 (alteration in original) (quoting *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005)).  The "decision to conduct a file-only review might raise questions about the benefits determination, particularly where the right to conduct a physical examination is specifically reserved in the plan." *Id.* (citing *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006)).

Although the Policy reserved the right to require Bencivenga to appear for a medical examination by a designated physician, Unum did not avail itself of the opportunity.  (ECF No. 15-1, Pg ID 316.)  Thus, as in *Judge*, a question arises as to "whether the file review conducted" here "is of the kind to which [the Sixth Circuit] has taken exception." *Judge*, 710 F.3d at 663.  Exception has been taken to file-only reviews, for instance, "where the file reviewer concludes that the claimant is not credible without actually having examined him or her." *Id.* (citing *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 555 (6th Cir. 2008)); *Calvert*, 409 F.3d at 297 n.6 ("[T]here is nothing inherently improper with relying on a file review, even one that disagrees with the conclusions of a treating physician. Where, as here, however, the conclusions from that review include critical credibility determinations regarding a claimant's medical history and

23

symptomology, reliance on such a review may be inadequate."). The Sixth Circuit has also found fault with a file review "when the plan administrator, without any reasoning, credits the file reviewer's opinion over that of a treating physician." *Judge*, 710 F.3d at 663 (citing *Elliott*, 473 F.3d at 620).

Here, none of Unum's reviewing medical practitioners physically examined Bencivenga. While this fact alone does not render Unum's determination erroneous, the use of file-only reviews raises concerns in this case for two reasons: (1) Unum rejected Dr. Carney's opinion that Bencivenga was unable to return to work based on only a paper record and (2) Unum's termination decision appears to rely, in large measure, on its belief that Bencivenga is less than fully credible.

a.   *Weight Given to Treating Physician*

As the Sixth Circuit has explained, "[w]hether a doctor has physically examined the claimant is indeed one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician." *Kalish v. Liberty Mut./Liberty Life Assurance Co.*, 419 F.3d 501, 507-08 (6th Cir. 2005). The Court recognizes that "the Supreme Court has explicitly declined to extend the treating physician rule to ERISA cases." *McCollum v. Life Ins. Co. of N. Am.*, 495 F. App'x 694, 702 (6th Cir. 2012) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 123 S. Ct. 1965, 1967 (2003) ("We hold that plan administrators are not obliged to

24

accord special deference to the opinions of treating physicians.")).  However,

"nothing in *Nord* prohibits a court weighing the opinions between two physicians

from taking into account that a nontreating physician has not personally examined

the claimant."  *Id.* at 703.  Further, in *Nord*, "[t]he Supreme Court . . . admonished

that 'plan administrators . . . may not arbitrarily refuse to credit a claimant's

reliable evidence, including the opinions of a treating physician."  *Evans v.

UNUMProvident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006) (quotation omitted); *see

also id.* ("[A] plan may not reject summarily the opinions of a treating physician,

[and] must instead give reasons for adopting an alternative opinion.").

It is true that Unum did more than simply discredit Dr. Carney's restrictions

and limitations on the basis that the objective medical evidence failed to support

them, but the justifications set forth by Unum are, in this Court's view,

questionable at best.  The justifications, or reasons for Unum's rejection of Dr.

Carney's physician, consist of: (1) Unum's unstated (but certainly heavily implied)

belief that environmental circumstances such as financial and legal troubles were

largely responsible for his intense cervical pain; (2) Dr. Sternbergh's belief that

parts of Bencivenga's cervical spine are beginning to fuse, thus resulting in

decreased pain; (3) the reduction in strength of pain killers prescribed to

Bencivenga; and (4) Bencivenga's questionable credibility.  The Court is not

persuaded that these reasons supplied Unum with an objectively verifiable or

25

reasoned basis on which to terminate Bencivenga's benefits, particularly when the termination was based solely on file reviews.

While there is some support in the record for Unum's belief that Bencivenga's physical condition was influenced by his mental health, there is also evidence to the contrary. This is relevant because Unum terminated Bencivenga's disability benefits on the basis that he exhausted the twenty-four month behavioral health limitation contained in the Policy, even though Bencivenga never sought disability benefits in connection with his mental health conditions. By construing Bencivenga's physical pain as the product of psychological stressors, Unum could then terminate Bencivenga's benefits under the theory that he exhausted his mental health benefits. Amplifying the suspect nature of this approach is that while it is evident from reading the administrative record, particularly Dr. Sternbergh's report on appeal, that this was Unum's strategy, Unum has done its best to conceal it and indeed has not made any mention of it.[22]

---

[22] That this was Unum's strategy is evidenced by a progress note on May 1, 2013. This note provides:

> Per review, it is reasonable that the insured's [behavioral health] condition caused or contributed to a lack of functional capacity at least since 10/18/10. LTD policy provision limits benefits to 24 months for mental illness, alcholism [(*sic*)] or drug addiction. Period would be 10/18/10 to 10/17/12.

(ECF No. 14-1, Pg ID 3851.)

26

The evidence Unum cites in support of its belief that Bencivenga's mental health caused his pain are treatment notes from Dr. Luby in late 2010:

> "Curiously, his neck pain is gone. When he was told that it was stress related he then began to see himself as a fraud. He is also concerned about the fact that he is on disability and he recently made a call to a client."

> "He received a letter stating that he will lose his Social Security disability. Now he knows that he will also lose his Unimin [(*sic*)] disability. . . . He is still experiencing some pain but he knows that it is magnified 'one thousand times' by the environmental circumstances in his life."

(ECF No. 16-3, Pg ID 2636, 2634.) Also, Dr. Sternbergh's report noted:

> Although claimant's internist and attorney have opined he has behavioral health issues because of cervical pain, claimant's long time psychiatrist . . . has stated the opposite. Cervical symptoms were improved when behavioral health symptoms were optimized.

(ECF No. 17-2, Pg ID 4059.)

Crediting this evidence over Dr. Carney's opinion that Bencivenga's mental health symptoms were the result of his physical limitations strikes this Court as a thin reed on which to hang an argument, particularly when Bencivenga had never reported his behavioral health conditions as the basis for his disability. The conclusions are also undermined by a letter authored by Dr. Luby on March 20, 2013, which an Unum report summarizes as stating: "Depression is only one factor in his disability, persistent cervical pain is, perhaps, [an] even [] more important symptom." (ECF No. 17-1, Pg ID 3860.) Dr. Carney, Bencivenga's treating

27

physician, has insisted throughout that Bencivenga's chronic pain syndrome "significantly affect[s] his life and prevents him from working to the fullest capacity in his previous position as an insurance agent. Minimal activities, minimal lifting and long periods of inactivity, such as desk work or phone work, cause him intermittent significant pain." (ECF No. 17-2, Pg ID 4069.)

With respect to Dr. Sternbergh's medical file review, the Court questions how Dr. Sternbergh could opine that Bencivenga's spine is beginning to fuse without having physically examined him. Indeed, this opinion, given in late 2013, would have been far stronger had Dr. Sternbergh produced diagnostic imaging or other objective medical evidence to corroborate this hypothesis. Instead, Dr. Sternbergh relied on an MRI from August 2012, an image produced well over a year prior to his review of Bencivenga's file. *See Elliott*, 473 F.3d at 621 ("Although we continue to believe that plans generally are not obligated to order additional medical tests, in cases such as this, plans can assist themselves, claimants, and the courts by helping to produce evidence sufficient to support reasoned, principled benefits determinations.").

Unum also contends that the reduction in the number and strength of pain medications prescribed to Bencivenga illustrates his recovery from being disabled. (Def.'s Br. 16.) In years past, Bencivenga was prescribed Methadone, Oxycodone, and Xanax, whereas by 2013, he was taking only Tylenol # 4 and ibuprofen. (*Id.*)

28

While the Court acknowledges that the medications in 2013 are less potent than those previously prescribed, there is ample evidence in the administrative record indicating that Bencivenga's physicians were concerned about continued prescription of narcotics, many of them opiates. (*See, e.g.*, ECF No. 17-1, Pg ID 3704.) In a report conducted by Unum evaluating whether Bencivenga had exhausted the Policy's behavioral health limitations, the reviewer noted that Bencivenga's "[p]ain specialist wants to put him on Suboxone but he is refusing, but he knows it is being used to control Heroin addiction."[23] (ECF No. 16-4, Pg ID 2951.) For this reason, which is never mentioned by Unum although the record is replete with references to concerns about Bencivenga's prolonged usage of various narcotics, the Court is not persuaded that the changes to Bencivenga's medication regimen is evidence of any vast improvement to his underlying medical condition.

b.    *Credibility*

Unum also terminated Bencivenga's benefits based on its determination that Bencivenga's complaints of disabling pain were less than fully credible. Unum has done so by citing to the ALJ's opinion denying Bencivenga's social security

---

[23] According to the United States Food and Drug Administration ("FDA"), Suboxone is a "medication approved for the treatment of opiate dependence." Subutex and Suboxone Questions and Answers, June 13, 2014, http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm191523.htm.

benefits and also by suggesting that Bencivenga's complaints of pain have been exaggerated.

With respect to the ALJ's adverse disability determination, Unum quotes a portion of the opinion indicating that Plaintiff's "allegations regarding the limiting effects of his impairments are exaggerated."  (ECF No. 17-1, Pg ID 3706.)  Indeed, Unum weaves portions of the ALJ's opinion throughout its brief in an effort to attack Bencivenga's credibility.  (Def.'s Br. 5 (noting that the ALJ found that "claimant's statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not credible [to the extent they are inconsistent with the above residual functional capacity assessment].") (quoting ECF No. 17-1, Pg ID 3703).) While Unum endeavors to cast Bencivenga in a harsh light, the ALJ did note instances in which he deemed Bencivenga's testimony regarding his pain and symptoms credible.  (ECF No. 17-1, Pg ID 3705.)

With respect to Bencivenga's alleged symptom exaggeration to Dr. Carney, Unum directs this Court to case law from the Seventh Circuit providing:

> We have also recognized that "[m]ost of the time, physicians accept at face value what patients tell them about their symptoms; but insurers . . . must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk)."

*Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 607 (7th Cir. 2007) (alteration in original) (quoting *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004)).

30

While the Court agrees that reliance on a claimant's subjective complaints of pain alone presents issues related to credibility, a review of the entire administrative record suggests that Unum may be overstating its case in this regard.  For instance, in its Reply Brief, Unum explains that Bencivenga's complaints of disabling pain were contradicted by his own statements to Dr. Luby in 2011 and 2012 that his pain had diminished significantly and that he had in fact returned to work for several hours per day.  (Def.'s Reply 3.)

Indeed, Unum devotes a significant portion of its brief to statements Bencivenga made to his psychiatrist, Dr. Luby.[24]  For instance, Unum focused on the following treatment notes from Dr. Luby in late 2010 (when, according to Unum, the restrictions and limitations were still supported):

> "Curiously, his neck pain is gone.  When he was told that it was stress related he then began to see himself as a fraud. . . ."

> ". . . .  He is still experiencing some pain but he knows that it is magnified 'one thousand times' by the environmental circumstances in his life."

(ECF No. 16-3, Pg ID 2636, 2634.)  Other notes relied upon included statements indicating that Bencivenga "is now thinking about a resumption of his career, possibly a return to selling insurance. . . .  His chronic cervical pain has eased

---

[24] Unum also cites evidence from Dr. Park, who examined Bencivenga on one occasion, describing Bencivenga as being "in minor discomfort due to pain." (ECF No. 17-1, Pg ID 3656-57.)

considerably." (*Id.* at Pg ID 2629, Pg ID 2626 ("He is thinking about returning to the insurance business.").)

A review of the treatment notes from Dr. Luby suggests that Unum cherry-picked notes favorable to its termination decision. For instance, while the notes from early 2011 state that Bencivenga's pain had diminished, a June 2011 treatment note provides:

> Dante's cervical pain has recurred. He is going to the University of Michigan and then to the Cleveland Clinic to see if there is any surgical intervention, which might be helpful . . . . Dante does not exercise because of his neck.

(*Id.* at Pg ID 2680.) In July, Dr. Luby noted that "The pain has become more severe . . . . I told him that I understood that his pain was very real. Certainly, upon looking at the MRI report there was solid [] justification for it." (*Id.* at Pg ID 2679.) In September, Dr. Luby indicated that "[a] persistent problem is his chronic cervical pain. He will see a surgeon next week to determine if there is a surgical answer." (*Id.* at Pg ID 2899.)

Treatment notes from 2012 are more favorable to Unum's position. In June 2012, Dr. Luby indicated "[Bencivenga] is becoming more involved in his insurance business." (ECF No. 17, Pg ID 3548.) By July, Bencivenga was described as "working four to five hours a day."[25] (*Id.* at Pg ID 3547.) Once

---

[25] This note undercuts Bencivenga's position that his "comments to his psychiatrist do not state more than [a] desire to return to [work]." (Pl.'s Resp. 3.)

again, however, Unum appears to disregard the evidence unfavorable to its position. In August 2012, Dr. Luby authored a treatment note indicating that Bencivenga's "brother is selling the insurance. Dante is occasionally called in for consultation but he is not that active in the business." (*Id.* at Pg ID 3546.) The following month, Dr. Luby wrote "[a]lthough Dante is not out in the field selling insurance he does benefit from his brother's efforts." (*Id.* at Pg ID 3545.) In October, Dr. Luby noted that "[h]is brother, John, does much of the work." (*Id.* at Pg ID 3544.) A November 2012 treatment note does indicate, however, that Bencivenga "does have difficulty motivating himself to work." (*Id.* at Pg ID 3542.) The Court finds that, on the whole, the statements to Dr. Luby do raise questions about Bencivenga's credibility. However, when credibility determinations factor significantly into an insurer's decision to terminate benefits, the use of a file review is improper.

c.    *Summary of File Reviews*

In concluding its discussion of the propriety of the file reviews conducted here, the Court notes that the Sixth Circuit has explicitly taken exception to file-only reviews "where the file reviewer concludes that the claimant is not credible without actually having examined him or her." *Judge*, 710 F.3d at 663 (citation omitted); *Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 263-64 (6th Cir. 2006) (discussing impropriety of relying on a non-examining medical reviewer to

33

determine severity and credibility of pain); *Calvert*, 409 F.3d at 297 n.6 ("Where, as here, however, the conclusions from that review include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate.").  Unum's reliance on Bencivenga's lack of credibility, coupled with the fact that Dr. Carney repeatedly indicated that Bencivenga was unable return to his past work, raises questions about Unum's decision to conduct only file reviews, particularly given its right – specifically reserved in the Policy – to conduct a medical examination.

## 2.   *Unum's Termination Decision and Its Relationship with the SSA's Disability Determination*

Bencivenga contends that Unum erroneously relied on the SSA's determination that Bencivenga was not disabled within the meaning of the Social Security Act; indeed, each of the three 2013 file-reviews explicitly referenced this determination.  Bencivenga argues that the conclusions reached by the ALJ did "not address the contractual relationship between Plaintiff and Defendant" and, therefore, are not relevant.  (Pl.'s Resp. 2.)  Unum recognizes "that the SSA's disability determination is not binding in an ERISA disability benefits case because the plan's disability criteria may be different from that of the SSA."  (Def.'s Reply 2 (citing *Whitaker v. Hartford*, 404 F.3d 947 (6th Cir. 2005)).)  However, Unum responds to Bencivenga's contention by noting that "the SSA's disability decision 'is far from meaningless.'"  (*Id.* at 3 (quoting *Calvert*, 409 F.3d at 294).)  This is

because, in Unum's estimation, the inquiries made by it and the SSA were similar, framing the issue as whether "Bencivenga [is able to] perform the duties of a sedentary occupation[.]"  (*Id.*)

The ALJ determined that Bencivenga's "physical impairments do not meet or medically equal the criteria of musculoskeletal listing 1.04[,]" which has a set of defined criteria that must be met.  (ECF No. 17-1, Pg ID 3701.)  No such criteria exist within the four corners of the Policy; rather, the Policy explicitly provides that a claimant must demonstrate that "because of injury or sickness" he or she is unable to "perform each of the material duties of [their] regular occupation."  (ECF No. 15-1, Pg ID 296.)  Further, placing great weight on the ALJ's conclusion that Bencivenga retained the functional capacity to perform light work, which is by definition less restrictive than sedentary work, Unum glosses over the portion of the ALJ's opinion that Bencivenga "is unable to perform any past relevant work," including his occupation as an insurance agency owner.  (ECF No. 17-1, Pg ID 3707.)  Despite this omission, it appears that the ALJ's decision attributes Bencivenga's restriction to simple, unskilled work (the occupation of an insurance agent owner is a skilled occupation) to a low global assessment of functioning ("GAF score").  (*Id.* at Pg ID 3706-07.)  However, although each of the three file-reviewers had access to the ALJ's determination, not one made any mention of the ALJ's finding that Bencivenga could not perform past relevant work, much less

attempted to explain what facts motivated their disagreement with the SSA's determination.  In this Court's opinion, "[t]his raises . . . questions about the thoroughness and accuracy of these file reviews."  *Bennett*, 514 F.3d at 555.  This is particularly true given the Policy's definition of disability, which expressly references a claimant's ability to "perform each of the material duties of [their] regular occupation."  (ECF No. 15-1, Pg ID 296.)

While the Court does harbor concerns about Unum's purported reliance on the ALJ's disability determination, in regard to Bencivenga's *physical* health, the ALJ's determination appears consistent with Unum's.  The ALJ noted that Bencivenga's "pain is under relative control with pain management medication and other modalities[.]"  (ECF No. 17-1, Pg ID 3706.)   Further, Bencivenga's statements to Dr. Luby that he was participating in the insurance business – even if only in a limited manner – appear to undercut the ALJ's restriction to unskilled work.

### 4.     *Length of Time Receiving Disability Benefits*

The Court harbors one final concern with Unum's termination of Bencivenga's benefits, namely, it finds the termination "of benefits [] surprising given the many years that it classified [Bencivenga] as disabled."  *McCollum*, 495 F. App'x at 704 (citing *Kramer v. Paul Revere Life Ins. Co.*, 571 F.3d 499 (6th Cir. 2009)).  In both *McCollum* and *Kramer*, the Sixth Circuit expressed reservation

36

about the defendant-insurer's termination of disability benefits where there was "no explanation for the decision to cancel benefits that had been paid or some five years based upon the initial determination of total disability in the absence of any medical evidence that the plaintiff's condition had improved during that time." *Kramer*, 571 F.3d at 507. While *McCollum* explained that "*Kramer* does not create a rule that when a plan administrator suddenly changes course, the administrator must have new evidence of improvement[,]" the court did state that "the plan administrator must have some reason for the change based on any number of factors." *McCollum*, 495 F. App'x at 704 (citing *Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x 978, 984 (6th Cir. 2010) (describing "the lack of evidence of improvement as a circumstance to be weighed by a reviewing court, rather than per se proof of arbitrariness") (citation omitted)); *see also Neaton v. Hartford Life & Accident Ins. Co.*, 517 F. App'x 475, 476 n.2 (6th Cir. 2013) ("It is unreasonable to find that a claimant ceases to be disabled absent a change in the underlying medical condition.") (citation omitted). *But see Likas*, 347 F. App'x at 167 ("Plaintiff must provide continued proof of his disability under the policy; [the insurance company] does not bear the burden of showing that plaintiff's eligibility has ended.") (internal quotation marks omitted).

In this case, Unum cites Bencivenga's statements to Dr. Luby as well as the change in Bencivenga's prescribed medications to demonstrate that he is no longer

disabled.  As addressed above, the statements to Dr. Luby do undermine Bencivenga's claimed entitlement to disability benefits to a limited degree.  The Court notes, however, that the statements to Dr. Luby are mixed in that some support Bencivenga's position while others support Unum's.  In other words, the mixed reporting supports the idea that Bencivenga is fine some days, but not others.  As it pertains to the alterations in Bencivenga's prescribed medications, the Court does not believe that the changes referenced by Unum are as supportive of its position as it suggests.

**5.**     ***Remedy for Unum's Improper Termination of Benefits***

Reviewing the record *de novo*, the Court concludes that Unum improperly terminated Bencivenga's long-term disability benefits.  This conclusion carries with it two remedial options: the Court "may either [retroactively reinstate and] award benefits to the claimant or remand to the plan administrator."  *Elliott*, 473 F.3d at 621.  In *Elliott*, the Sixth Circuit articulated "the principles relevant to the selection of a remedy for a plan administrator's erroneous denial of benefits." *Shelby Cnty. Health Care Corp. v. Majestic Star Casino, LLC Group Health Benefit Plan*, 581 F.3d 355, 373 (6th Cir. 2009).  *Elliott* explained that "where the 'problem is with the integrity of [the plan's] decision-making process,' rather than 'that [a claimant] was denied benefits to which he was clearly entitled,' the

appropriate remedy generally is remand to the plan administrator." *Elliott*, 473 F.3d at 622 (quotation omitted).

"Remand is therefore appropriate in a variety of circumstances, particularly where the plan administrator's decision suffers from a procedural defect or the administrative record is factually incomplete." *Shelby Cnty.*, 581 F.3d at 373. "In contrast, where 'there [was] no evidence in the record to support a termination or denial of benefits,' an award of benefits is appropriate without remand to the plan administrator." *Id.* (quotation omitted).

As an initial matter, the Court recognizes that *Elliott*, *Shelby County*, and *Helfman* were cases decided using the very deferential arbitrary and capricious standard of review. In those cases, remand was deemed appropriate because the plan administrators failed to articulate a principled or reasoned decision in either terminating or denying benefits. In a case reviewing a plan administrator's decision under the *de novo* standard, such as the case at bar, "whether a plan administrator's decision was principled or reasoned" "is irrelevant[.]" *Javery*, 741 F.3d at 699. However, a "district court's standard of review and authority to remand are legally and analytically distinct, and, even under *de novo* review, remand is the appropriate remedial measure where further fact-finding is necessary to determine claimant eligibility for benefits." *Id.* (citation omitted).

Here, Unum's decision to terminate Bencivenga's benefits entailed a questionable procedural practice (e.g., Unum's use of file-only reviews despite its right to request an independent medical evaluation) and was based upon the selective review of medical evidence. Despite these errors, however, the Court is unable to conclude that Bencivenga is "clearly entitled" to reinstatement of his long-term disability benefits. *Elliott*, 473 F.3d at 622. In other words, the Court does not believe that there was "no evidence in the record to support [the] termination . . . of benefits[.]" *Shelby Cnty.*, 581 F.3d at 373. For this reason, the Court believes that remanding the action to the plan administrator is the proper course of action. The Court emphasizes that the remand is not for the "impermissible purpose of affording the plan administrator a chance to correct its reasoning for" terminating Bencivenga's benefits. *Javery*, 714 F.3d at 700. Rather, the remand is ordered "for the permissible purpose of further fact-finding to supplement what" the Court feels is "an incomplete record." *Id.* This supplementation should include an independent medical examination. Further, the plan administrator should consider whether Bencivenga is partially disabled as that term is defined in the Policy.

**B.     Unum is Entitled to Partial Summary Judgment on its Counterclaim**

Unum contends that it is entitled to partial summary judgment on its counterclaim seeking reimbursement for overpayments made to Bencivenga.

40

(Def.'s Br. 18.)  Specifically, Unum maintains that Bencivenga received certain income from the insurance agency that was not disclosed, and that this income should have offset the amount of the disability payments made to him pursuant to the terms of the Policy.  As relief, Unum seeks to recoup the funds paid to Bencivenga in excess of the amount he should have received.  However, due to insufficient documentation provided by Bencivenga for the tax years of 2012 and 2013, Unum is unable to determine with precision the full amount due and owing.[26]  Thus, Unum seeks summary judgment solely on the issue of liability.

## 1.   *Governing Legal Standard*

Federal Rule of Civil Procedure 56 instructs courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (2012).  A court assessing the appropriateness of summary judgment asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir.

---

[26] Unum's calculations indicate that Bencivenga was overpaid in the amount of $56,177.21 for the years 2010 and 2011.  Because Bencivenga has not yet provided his tax returns for 2012 and 2013, Unum estimated Bencivenga's income and suggests that Bencivenga was overpaid $36,445.22 during this time.  This brings the total overpayment to approximately $92,622.42.

2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986)).

## 2.    *Application*

Unum's counterclaim is governed by ERISA.  It is well-established in this Circuit that plan fiduciaries may recover overpaid benefits when the terms of an ERISA plan so permit.  *Gilcrest v. UNUM Life Ins. Co. of Am.*, 255 F. App'x 38, 46 (6th Cir. 2007).

Pursuant to 29 U.S.C. § 1132(a)(3)(B)(ii), a fiduciary may bring a civil action "to obtain other appropriate *equitable* relief . . . to enforce . . . the terms of the plan." *Id.* (emphasis added).  "'For restitution of insurer payments to be of an equitable nature [and thus recoverable under ERISA], the restitution must involve the imposition of a constructive trust or equitable lien on "particular funds or property in the [insured]'s possession."'" *Sosinski v. Unum Life Ins. Co. of Am.*, 15 F. Supp. 3d 723, 732-33 (E.D. Mich. 2014) (alterations in original) (quoting *Hall v. Liberty Life Assurance Co. of Boston*, 595 F.3d 270, 274-75 (6th Cir. 2010)).  "The plan must identify a particular fund, distinct from an insured's general assets, and the portion of that fund to which the plan is entitled." *Id.* (quotation omitted).   Under *Gilcrest*, overpayments made to an insured satisfy the particular fund requirement.  255 F. App'x at 45-46.

On February 8, 2008, Bencivenga signed a "Reimbursement Agreement," in which he agreed "to repay any overpayment incurred as a result of receiving any other benefits from those sources specified in the policy." (ECF No. 15-2, Pg ID 635.) Although the Reimbursement Agreement refers to "benefits," the introductory paragraph provides:

> The policy under which I am covered provides that my disability benefits may be reduced by other benefits that I . . . may receive or are eligible to receive under, but not limited to, any act or law commonly known as Workers' Compensation and/or Social Security Administration benefits and/or *other sources of benefit reduction as outlined in my policy*.

(*Id.* (emphasis supplied).)

The portion of the Policy describing how benefits are calculated provides:

[I]f you are earning more than 20% of your indexed pre-disability earnings in your regular occupation or another occupation, then the monthly benefit will be figured as follows:

1.  During the first 12 months, the monthly benefit will not be reduced by any earnings until the gross monthly benefit plus your earnings exceed 100% of your indexed pre-disability earnings. The monthly benefit will then be reduced by that excess amount.

2.  After 12 months, the following formula will be used to figure the monthly benefit.

$$(A \text{ divided by } B) \times C$$

A = Your "indexed pre-disability earnings" minus your monthly earnings received while you are disabled.

B = Your "indexed pre-disability earnings".

43

C = The benefit as figured above.

(ECF No. 15-1, Pg ID 309.)

Reading the Policy with the Reimbursement Agreement, Unum contends that it is entitled to restitution for any overpayments it made to Bencivenga because Bencivenga earned more than twenty percent of his pre-disability earnings while disabled and his monthly payment was never adjusted to account for these earnings. [27]  These earnings came in the form of K-1 profit distributions from the insurance agency (Bencivenga's "regular occupation").

The administrative record reveals that Plaintiff filed a Schedule C as part of his 2009, 2010, and 2011 federal income tax returns.  (ECF No. 17, Pg ID 3532 (2009 return); ECF No. 16-5, Pg ID 3164 (2010 return); ECF No. 16-5, Pg ID 3268 (2011 return).)  Each Schedule C asks whether Bencivenga "materially participate[d]" in the business.  On each form, Bencivenga answered this question affirmatively.  The gross receipts, as well as the net income, for the years in question are summarized in the following chart:

| Year | 2009 | 2010 | 2011 |
|---|---|---|---|
| **Gross Receipts** | $204,538 | $193,290 | $184,188 |
| **Net Income** | $155,623 | $153,789 | $146,468 |

---

[27] This is evidenced by the fact that Bencivenga received the maximum monthly benefit of $6,000 per month.  (*See* 1999 Rider, ECF No. 17-1, Pg ID 3849 (amending Policy to increase the maximum monthly benefit from $5,000 per month to $6,000 per month).)

44

Although Bencivenga reported the gross receipts on his Schedule Cs, the net income was transferred to an LLC called Dante J Bencivenga Insurance Agency, LLC (the members of the LLC are Bencivenga, his wife, and his brother) before being reported as income by Bencivenga's wife.  However, Bencivenga owns ninety-seven percent of that LLC and is listed as the "Tax Matters Partner," who possesses the power to allocate income among the three LLC members.  (*See, e.g.*, ECF No. 17-1, Pg ID 3844.)  Thus, although Bencivenga owns ninety-seven percent of the LLC, one hundred percent of the LLC's net income was reported by Bencivenga's wife, whose ownership interest amounted to a mere one percent in the years for which tax returns have been provided.  (ECF No. 17-1, Pg ID 3839.)

Notably, before Bencivenga applied for disability benefits, he allocated over ninety-nine percent (99.9%, to be exact) of the K-1 distributions to himself and reported those distributions as income on his tax returns.  (ECF No. 15-1, Pg ID 349.)  This is notable for two reasons reasons.  First, the way the K-1 distributions were reported in the past belies Bencivenga's claim that this income is "passive income" and therefore does not constitute "earnings" within the meaning of the Policy.  (Pl.'s Resp. 8, 3 (""[T]he policy refers to deductions of benefits relating to earnings.  But Bencivenga received income from investment, not labor, thus not earnings.").)  While Bencivenga asserts that the K-1 distributions do not constitute earnings, his contentions are not supported by meaningful legal analysis or

45

authority.[28]  Moreover, these distributions were considered in calculating the

amount of Bencivenga's disability benefits and were "earnings" for this purpose.

Second, and relatedly,  Unum points to the Internal Revenue Service's

related party rules in support of its contention that it can disregard how Bencivenga

(the "Tax Matters Partner") allocated the K-1 distributions at issue (transferring net

income to the LLC and having his wife report that income on her returns).  26

U.S.C. § 267.  This argument has been met with silence by Bencivenga.

In short, Bencivenga fails to persuade this Court that the K-1 distributions

should not be considered "earnings" that offset the maximum monthly benefit to

which he would have been entitled had those earnings not existed.[29]  Therefore, the

---

[28] Although Bencivenga's Response does not argue that the earnings are the result of commission renewals, Unum's Reply provides authority for the proposition that renewal commissions represent compensation for personal services previously received and constitute "earned income" under the Internal Revenue Code.  *Estate of Thomas F. Remington v. Comm'r*, 9 T.C. 99 (1947).

[29] The Court notes that to the extent Bencivenga argues that the offsetting provision renders the Policy unenforceable as an illusory contract, the Court does not agree.  Further, besides a block quote regarding illusory contracts, Bencivenga cites no legal authority for the proposition he urges the Court to adopt.  The Court will therefore not address the argument.  As courts have reiterated time and time again, "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court . . . to put flesh on its bones."  *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir. 1995) (citation omitted); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Court concludes that Unum should prevail on the liability portion of its counterclaim.

## IV.   CONCLUSION AND ORDER

Having reviewed the administrative record through the lens of *de novo* review, the Court concludes that Unum erred in terminating Bencivenga's disability benefits.  The Court therefore **DENIES** Unum's Motion for Judgment on the Administrative Record.  However, because Bencivenga has not conclusively established that he is disabled as defined in the Policy, the Court declines to retroactively reinstate Bencivenga's benefits.  Rather, the Court **REMANDS** the action to the plan administrator (Unum) for further development of the record. This further development should include an independent medical examination. Further, the plan administrator should consider whether Bencivenga is partially disabled as that term is used in the Policy.

In addition, and for the reasons set forth above, the Court concludes that Bencivenga must repay funds he received from Unum in excess of the amount to which he was entitled.  Therefore, the Court **GRANTS** Unum's Motion for Partial Summary Judgment on its counterclaim.

**IT IS SO ORDERED**.

Dated: March 27, 2015

                                        s/PATRICK J. DUGGAN
                                        UNITED STATES DISTRICT JUDGE

Copies to:

**James C. Klemanski, Esq.**
**D. Andrew Portinga, Esq.**
**J. Michael Smith, Esq.**